UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

---x
In re: MCI COMMUNICATIONS CORP. SECURITIES LITIGATION : 97-CV-1976 (RWR)
---x

FILED
JAN 1 7 2003
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

COHEN, MILSTEIN, HAUSFELD & TOLL, PLLC
Herbert E. Milstein, Esq.
Daniel S. Sommers, Esq.
R. Joseph Barton, Esq.
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, D.C. 20005
(202) 408-4600

*Plaintiffs Liaison Counsel*

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
Jeffrey G. Smith, Esq.
Kate McGuire, Esq.
270 Madison Avenue
New York, NY 10016
(212) 545-4600

ABBEY GARDY, LLP
James S. Notis, Esq.
Ilana Kohn, Esq.
212 East 39th Street
New York, New York 10016
(212) 889-3700

*Plaintiffs Co-Lead Counsel*

79

**Table of Contents**


Page

I. PRELIMINARY STATEMENT ........ 1

II. ARGUMENT ........ 2

A. Plaintiffs Readily Satisfy All of the Requirements of Rule 23(a). ........ 2

1. The Plaintiffs Meet the Typicality Requirement of Rule 23(a)(3) ........ 3

2. The Plaintiffs Meet the Commonality Requirement of Rule 23(a)(2) ........ 26

3. Plaintiffs Satisfy the Adequacy Requirement of Rule 23(a)(4) ........ 27

B. Plaintiffs Have Shown Predominance under Rule 23(b)(3) ........ 33

1. The Presence of Arbitrageurs Demonstrates That Class Certification is Proper ........ 34

2. Defendants Allegations of Market Skepticism Do Not Vitiate Predominance ........ 36

3. Common Questions Predominate Despite Various Purchases ........ 37

4. The August 20th Statement Did Not Cure Defendants' Misrepresentations ........ 40

C. Class Is Superior to Other Means for Adjudication ........ 43

III. CONCLUSION ........ 44

## I. PRELIMINARY STATEMENT

Plaintiffs Maurice Teitelbaum, Philip Cirella, David Knetzer, and Eleanor Werbowsky, the proposed class representatives here, submit this memorandum in reply to defendants' opposition ("Def. Mem.") to plaintiffs' motion for class certification and in further support of plaintiffs' motion.

Defendants found their opposition on an incomplete and misleading characterization of plaintiffs' testimony to try to make plaintiffs appear atypical and inadequate, and go on to raise a selection of unsupported and/or irrelevant arguments against class certification. Defendants do not challenge numerosity under Rule 23(a)(1) and appear to concede the adequacy of plaintiffs' counsel under Rule 23(a)(4). The main thrust of defendants' brief is devoted to arguments that plaintiffs are subject to "unique defenses" concerning reliance that purportedly vitiate their typicality and adequacy. These include allegations that one plaintiff relied on his broker for investment advice, another plaintiff relied on (non-inside) information from a friend who ran a local MCI sales office, another may have relied on relatives, two plaintiffs purchased MCI stock after partial disclosure, one plaintiff believed when making some of his purchases that the merger would be renegotiated, and one plaintiff suffers from an alleged lack of credibility. Such arguments, however, contradict the Supreme Court's holdings in Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177-78 (1974), and Basic Inc. v. Levinson, 485 U.S. 224, 241-247 (1988), as well as the overwhelming weight of the law that has developed since Basic was handed down. It is clear that the reliance based defenses asserted here in no way preclude class certification. Defendants' one sentence attack on commonality and confused attempts to argue that predominance and superiority are not satisfied in this garden variety securities fraud case add no weight to their opposition to class certification.

## II. ARGUMENT

### A. Plaintiffs Readily Satisfy All of the Requirements of Rule 23(a).

Each plaintiff purchased MCI stock during the class period when the price of MCI shares was artificially inflated by defendants' false representations that MCI's merger agreement with BT was not subject to renegotiation.[1] The core element of each plaintiff's claims is that he or she was damaged due to purchase of stock while the stock price was thus falsely elevated.

Numerosity under Rule 23(a)(1) is conceded here. Each plaintiff readily satisfies the commonality requirement of Rule 23(a)(2) because each shares abundant common questions of law and fact with the rest of the class. Likewise, each is a typical class member under Rule 23(a)(3) because "'each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability.'" In re Vitamins Antitrust Litig., 209 F.R.D. 251, 260 (D.D.C. 2002), quoting Advocate Health Care v. Mylan Labs, Inc. (In re Lorazepam & Clorazepate Antitrust Litig, 202 F.R.D. 12, 27 (D.D.C. 2001). Finally, each is adequate under Rule 23(a)(4) because each (1) has retained counsel that is experienced and qualified, and (2) has "objectives that are co-extensive with those of the class." Covelo Indian Community v. Watt, 551 F. Supp. 366, 377 (D.D.C. 1982).

[1] Defendants assertions that the market did not, in fact, believe that the merger would go through as planned (Def. Mem. at 3, 39), go toward the merits of the case and have no place in a motion for class certification. See, e.g., Eisen, 417 U.S. at 177-78. Even defendants admit that analysts and commentary went both ways. By raising the challenges again defendants seem to be questioning this Court's judgment on the motion to dismiss. In any event, it is not the law that if only some of the market questioned a defendant's lies he is off the hook; rather, when the result is that the market still suffers inflation, though not as high as it would otherwise be, fraud on the market still applies.

**1. The Plaintiffs Meet the Typicality Requirement of Rule 23(a)(3)**

**a. Typicality Is Not Vitiated By Minor Variations in Reliance**

Defendants assert that the plaintiffs did not rely on the integrity of the market for MCI stock and therefore cannot represent members of the class who are entitled to a presumption of reliance.[2] (Def. Mem. at 20-21.) But, they raise the types of arguments about "individual issues of reliance [that] will not defeat class certification." See Frietsch v. ReFco, Inc., 1994 WL 10014, at *6 (N.D. Ill. Jan. 3, 1994) ("Reliance issues [in securities actions] always vary among plaintiffs and to deny class certification on that basis would destroy the utility of class actions in securities fraud actions") (quoting In re Data Access Systems Sec. Litig., 103 F.R.D. 130, 147 (D.N.J. 1984), *rev'd on other grounds*); Queen Uno Ltd. Pshp. v. Coeur D'Alene Mines Corp., 183 F.R.D. 687, 694 (D. Colo. 1998) ("rebuttal of individual class member's reliance will not defeat class certification in any event").

In this Circuit, consistent with the standard across the nation, the typicality requirement "is satisfied if each class member's claim arises from the same course of events that lead to the

---

[2] In Basic, 485 U.S. 224, the Supreme Court rejected the notion that a plaintiff in a 10(b) action is required to show direct reliance on statements made by the defendant. Instead, the Supreme Court found "that where materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed." Id. at 247. To invoke this "fraud-on-the-market" presumption, a plaintiff must allege: (1) that the defendants made public misrepresentations; (2) that the misrepresentations were material; (3) that the shares were traded on an efficient market; (4) that the misrepresentations would induce a reasonable, relying investor to misjudge the value of the shares; and (5) that the plaintiff traded the shares between the time the misrepresentations were made and the time the truth was revealed. Basic, 485 U.S. at 248 n. 27. The complaint here alleges each of those elements and, therefore, plaintiffs are entitled to a presumption of reliance. Moreover, any argument against the application of the fraud-on-the-market doctrine (e.g., that MCI securities did not trade in an efficient market) raises questions of fact not cognizable on a class certification motion). See Basic, 485 U.S. at 249 n. 29.



304780v3

claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability." Jarvaise v. Rand Corp., Civil Action No. 96-2680 (RWR). 2002 U.S. Dist. LEXIS 6096, *6 (D.D.C. Feb. 19, 2002) (holding that a class alleging a pattern and practice of sex discrimination satisfied the typicality requirement despite individual fact differences), citing Pigford v. Glickman, 182 F.R.D. at 341, 348 (D.D.C. 1998). As the court emphasized in Lorazepam, 209 F.R.D. at 27, "[t]ypicality is met 'if each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability'." (quoting Pigford, 182 F.R.D. at 349). As another court in this District has noted, nothing in Rule 23(a)(3) requires plaintiffs to be identical with respect to their actions or methods of conduct. In re Vitamins Antitrust Litig., 202 F.R.D. at 260. The proper analysis is not of individual plaintiffs' characteristics, but of their claims, and "[t]he focus of the typicality inquiry in a case such "must be on the defendants' behavior and not that of plaintiffs." In re Sumitomo Copper Litig., 194 F.R.D. 480, 482 (S.D.N.Y. 2000). It is for this reason that, for example, in Johns v. Rozet, 141 F.R.D. 211, 216 (D.D.C. 1992), while approving class representatives against whom individual defenses were asserted, this District held that "[w]hile the defendants have raised claims and defenses against the named representatives, *there remain issues of the defendants' liability common to the entire class, for which plaintiff's claims are typical*" (emphasis added).

The Court may only consider the presence of highly divisive individual defenses in deciding motions for class certification. The standard, as is acknowledged even in defendants' quote of Kas v. Fin. General Bankshares, Inc., 105 F.R.D. 453, 461 (D.D.C. 1984) (see Def. Mem. at 20) is not simply that there be an arguable individual defense against the plaintiff, but that it is "predictable that *a major focus* of the litigation will be on [such a] . . . defense."

(Emphasis supplied.) Indeed, if defendants only had to raise some whimsy of a defense, no class could ever be certified. See Johns, 141 F.R.D. at 216 (distinguishing Kas, where counterclaims and defenses would not become focus of litigation").[3] Here for example, no plaintiff bought thinking the market over valued the MCI shares. Whatever doubts he or she may have had about the likelihood of a renegotiation, or whatever weighing he or she may have given to conflicting analyst reports and news speculation, no plaintiff bought knowing what was withheld from the market -- that BT and MCI were engaged in a revaluation of the price for the merger.

In fact, analysis of these plaintiffs' individual reliance or individual investment strategies would require the type of inquiry into the strengths and weaknesses of a plaintiff's claims that is forbidden by Eisen.[4] This has been made clear in countless cases since Basic. Even if some bizarre types of reliance could create a viable defense at the certification stage, defendants have

---

[3] Defendants' cases make clear the necessity that individualized defenses become a "major focus" of the litigation. Fleck v. Cablevision VII, Inc., 763 F. Supp. 622, 627 (D.D.C. 1991), described its fact pattern as similar to Kas, and is largely reliant thereon; Koos v. First Nat'l Bank, 496 F.2d 1162 (7th Cir. 1974), like Kas, indicated that Rule 23(a)(3) is not satisfied where "it is predictable that a *major focus* of the litigation will be on an arguable defense unique to the named plaintiff" (emphasis supplied); McNichols v. Loeb Rhoades & Co., 97 F.R.D. at 331, 334 (N.D. Ill. 1982), citing Koos v. First Nat'l Bank, indicated that the defense in question must be "likely to usurp *a significant portion* of the litigant's time and energy" (emphasis supplied).

[4] See, e.g., Gilbert v. First Alert, 904 F. Supp. 714, 720 (N.D. Ill. 1995) ("Moreover, investigation into the motivations behind individual plaintiffs' decisions to buy or sell stock would be improper at this time, given that we are prohibited from inquiring into the merits of the case."); In re Bally Mfg. Sec. Corp. Litig., 141 F.R.D. 262, 269 (N.D. Ill. 1992) ("[D]elving into a particular named plaintiff's investment strategy at [the class certification] stage likely would entail an impermissible consideration of the merits of the complaint itself"); Moskowitz v. Lopp, 128 F.R.D. 624, 631 (E.D. Pa. 1989) ("exactly what a plaintiff relied on in purchasing and selling his . . . stock is a question of fact which can not be resolved at the class action stage"); In re Storage Tech. Corp. Sec. Litig., 113 F.R.D. 113, 115-117 (D. Colo. 1986); In re Energy Sys. Equip. Leasing Sec. Litig., 642 F. Supp. 718, 752 (E.D.N.Y. 1986).

not demonstrated, with respect to any proposed class representative that any defense related to the trumped up "individual issues" here is likely to become a "major focus" of the litigation.

Not one of the cases that defendants cite bears enough factual similarity to the case at bar, or reflects with sufficient clarity the current state of the law, to suggest that denial of certification here might be warranted. For example, in Fleck v. Cablevision VII, Inc., 763 F. Supp. 622 (D.D.C. 1991), although the court noted that, under Basic, 10b-5 plaintiffs were entitled to a presumption of reliance, the plaintiffs' claims centered on the sale of limited partnership assets back to the general partner pursuant to a consent statement, and there was no question of fraud on the market. Moreover, the Fleck court relied on Kas, 105 F.R.D. 453 (D.D.C. 1985), which relied on McNichols v Loeb Rhoades & Co., 97 F.R.D. 331 (N.D. Ill. 1982), and a whole host of other cases that were decided before Basic. This line of decisions no longer represents the state of the law after more than a decade of decisions implementing Basic.[5] Defendants' other cases are unavailing for largely similar reasons.[6]

---

[5] The Fleck court, moreover, held that plaintiffs were not adequate representatives because they had not purchased the stock themselves (but had inherited) and did not vote on the transaction. Therefore, the Fleck plaintiffs took no action consistent with reliance.

[6] Kas, 105 F.R.D. 453 (D.D.C. 1985), which also predates Basic, turned on misstatements and omissions in a proxy statement in connection with a merger, thus, no fraud on the market was at issue. Moreover, plaintiffs, unlike most of the class, voted against the merger that the fraudulent statements promoted. Finally, the Kas court placed a great deal of weight on the class members holding 72,000 of the shares at issue who had *specifically indicated* that they did not wish to be represented by the proposed representatives. Ballan v. Upjohn Co., 159 F.R.D. 473, 481 (W.D. Mich. 1994), simply goes against the overwhelming majority of the law, and has been impliedly rejected by another Michigan district court (see In re KMart Corp. Sec. Litig., 1996 U.S. Dist. LEXIS 22609, *18 (E.D. Mich. Dec. 16, 1996) (refusing to reject a proposed class representative who allegedly did not rely on the market, because "any rebuttal evidence, which relates to the presumption of reliance on the integrity of the market, would have to involve the merits of the case [and] [h]ence the defense of nonreliance is not a basis for denial of class certification.") (citing Hanon v. Dataproducts Corp., 976 F.2d 497 (9th Cir. 1992); In re Pizza Time Theatre Sec. Litig., 112 F.R.D. 15, 20 (N.D. Cal. 1986)(lack of reliance is not defense and cannot be (continued…)

Since Basic, federal courts all over the country have rejected arguments similar to the ones that defendants make here, and have held that, because the issue of non-reliance is a question of fact, it *may not be rebutted* on a motion for class certification. See, e.g., In re MDC Holdings Sec. Litig., 754 F. Supp. 785, 802 (S.D. Cal. 1990) ("[i]ssues of non-reliance go to the merits of the case and are not a basis for denying class certification"); In re KMart Corp. Sec. Litig., Case No. 95-CS-75584-DT, 1996 U.S. Dist. LEXIS 22609, *18 (E.D. Mich. Dec. 16, 1996) (refusing to reject a proposed class representative who allegedly did not rely on the market, because "any rebuttal evidence, which relates to the presumption of reliance on the integrity of the market, would have to involve the merits of the case [and] [h]ence the defense of nonreliance is not a basis for denial of class certification"); H. NEWBERG, NEWBURG ON CLASS ACTIONS, ' 22.51 at 103 (3d ed. 1992) ("Even when reliance must be proved individually, this

(...continued)

considered in a certification motion); and Blackie v. Barrack, 524 F.2d 891, 901 n. 17 (9th Cir. 1975). Ballan, thus, has no persuasive value even in its own district. Rolex Employees Retirement Trust v. Mentor Graphics Corp., 136 F.R.D. 658 (D. Or. 1991), relied on Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176 17-980 (2d Cir. 1990), which was not a fraud-on-the-market case and involved a very unusual fact pattern and failed to provide any explanation or analysis for its conclusion, Gunther v. Pacific Telecom, Inc., 123 F.R.D. 333, 336 (E.D. Oregon 1988), which found that reliance was not a unique defense, and Ross v. Bank South, NA, 837 F.2d, 980, 990-91 (11th Cir.) which upheld decision certifying class even though defendants had raised individual defenses that "could be termed 'arguable.'" Kline, 88 F.R.D. 696, 700 (S.D.N.Y. 1981) predates Basic, and the real issue appears to have been *credibility:* "This Court's holding is directed to the issue of whether plaintiffs' credibility, affording defendants the opportunity to raise unique defenses, unduly burdens the class by rendering plaintiffs' claims atypical of the claims of all class members." McNichols, 97 F.R.D. 331, predates Basic and no longer reflects the law with respect to fraud on the market cases. Rodriguez v. Department of Treasury 108 F.R.D. 360 (D.D.C. 1985) is, similarly unavailing because there were no statements made to the class as a whole and market reliance was not at issue. Also, Semerenko v. Cendant is inapposite because the defendants' quoted language about rebuttal appears in the context of a discussion concerning motion to dismiss, not a motion for class certification.

factor will not bar class certification based on common issues of defendant's liability"). The overwhelming weight of the law indicates that even where individual issues of reliance exist, class certification should be granted unless "there are such obvious variances between the reliance by the proposed representatives and the absent class members that the Court can determine the issue will predominate with very little inquiry into the merits." In re Revco Sec. Litig., 142 F.R.D. 659, (N.D. Ohio 1992).[7] Here, where the plaintiffs possessed only information that was in, or was identical to what was in, the market, which concededly contained various speculations on the central point, there is no hint of a reliance issue that will predominate that is unique to any plaintiff in particular.

It should be noted that this District has viewed reliance as a damages-related issue, and not one that should preclude class certification. Johns, 141 F.R.D. at 218 (holding that "challenges . . . because of reliance have usually been rejected, because reliance goes to the issue of damages rather than to the underlying, predominant, common issue of liability" (citing *Newburg on Class Actions* § 4.26, at 326 (2d. ed. 1985).[8] "The preference in this jurisdiction seems to be to certify classes that share the same legal theory of recovery, even if there is a potential difference between claimants with respect to the damages owed to each individual class

---

[7] See also Johns, 141 F.R.D. at 218; In re Amerifirst Sec. Litig., 139 F.R.D. 423, 428 (S.D. Fla. 1991) (plaintiffs found typical, despite alleged unique defenses that they did not rely on the market, because "[this] is a question of fact which can not be resolved at this stage in the proceedings"; In re Control Data Corp. Sec. Lit., 116 F.R.D. 216, 221 (D. Minn. 1986) ("There is nothing unique about a defense of lack of reliance"); In re Energy Sys. Equip. Leasing Sec. Litig., 642 F. Supp. 718, 752 *E.D.N.Y. 1986).

[8] Defendant's citation to Kowal v. MCI Communications Corp., 16 F.3d 1271 (D.D.C. 1994) for the principal that to prevail on a securities class action fraud claim, a plaintiff must prove reliance on the purported misrepresentation, is of no use to them, as that case was at the motion to dismiss, rather than class certification stage, and was dismissed for reasons that had nothing to do with fraud on the market. See Kowal at 1276, n.2.

member, . . . . '[because] [a]ll putative class members share the same remedial theory and any potential conflicts over damages can be addressed appropriately at a later point.' Wells v. Allstate Ins. Co., 210 F.R.D. 1, 12 (D.D.C. 2002), quoting Lorazepam, 202 F.R.D. at 28-29.

**b. Reliance on Various Sources Does Not Render Plaintiffs Atypical**

Defendants contend that plaintiffs Teitelbaum, Knetzer, and Werbowsky are not typical because of the specific *sources* of some of their information -- i.e., a broker, a friend who worked for MCI (but had no inside information), and relatives, respectively. (Def. Mem. at 24-25, 27-29.) But none of these "sources" gave any of the plaintiffs any information or reasons to buy MCI shares that was different from the public information affecting the market price for the stock that the class relied upon as a fair reflection of material information. Investors always buy a stock for a variety of reasons based on the review of different publicly available information and different private discussions of that information. Quite simply, this is not a basis upon which to defeat class treatment in a securities fraud case. See Blackie, 524 F.2d at 907.

In fact the Supreme Court has made it quite clear that:

> Misleading statements will . . . defraud purchasers of stock even if the purchasers do not directly rely on the misstatements . . . The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.

Basic, 485 U.S. at 241-42 (quotation omitted). The presumption of reliance provided by the fraud on the market theory applies equally to "a professional investor, the class members as amateurs, and indeed, those who choose stock by means of a ouija board or by throwing darts at

the list." Kalodner v. Michaels Stores, 172 F.R.D. 200, 205 (N.D. Tex. 1997) (quotation omitted).[9]

As the court noted in In re Data Access, 103 F.R.D. at 139:

> [D]iffering types of reliance are present in almost every securities class action. There will always be some individuals who read the financial statements directly, others who read secondary analyses such as Moody's or Value Line, and many others who relied on the advice of stockbrokers or friends. If defendants' argument were to prevail that factual differences of this nature were sufficient to defeat class action certification, there could never be a class action of securities purchasers.

Defendants ignore the fact that under the fraud on the market doctrine, since reliance is presumed, the specific information relied on -- whether from a broker, analyst, or company insider -- does not affect typicality so long as it is consistent with the information disseminated in the market.[10]

---

[9] Kalodner does note, however, that reliance on insider information not available or reflected in what was available to the public might rebut reliance on the market. Defendants can make no showing of that here.

[10] See also See Danis v. USN Communications., Inc., 189 F.R.D. 391, 398 (N.D. Ill. 1999) (concluding that merely because proposed class representative may have to show his broker relied on the misrepresentations in recommending stock does not render him an atypical plaintiff); Cross v. Dickstein, 172 F.R.D 108, 114 (S.D.N.Y. 1997) (plaintiffs' purchase of stock solely on their brokers' recommendations does not render them atypical); Schaffer v. Timberland Co., Civil No. 94-634-JD, 1996 U.S. Dist. LEXIS 5372, *18 (D.N.H. Mar. 19, 1996) (different types of reliance are present in most securities actions, if that could defeat class certification, it would be impossible to ever certify a class of securities purchasers); Kline v. First W. Gov't Sec., Civil Action No. 83-1076, 1996 U.S. Dist. LEXIS 4019, *17 (E.D. Pa. March 14, 1996) ("several courts have noted that in a class action securities fraud case it is practically inevitable that different members of the class would have relied on the defendants' alleged misrepresentations or omission in different ways," including reliance on friends, brokers, secondary analysis, etc., but that this does not preclude reliance); Majeski v. Balcor Entertainment Co., 134 F.R.D. 240, 247 (E.D. Wis. 1991) ("plaintiffs' reliance on oral representations made by individuals unknown to the preponderance of class members does not render them atypical, but instead typical of all class members. . . . [because] [t]his court is convinced that in the real world, most individuals do not make investment decisions based solely on written or videotape materials, but instead on a combination of these materials and the oral representations of their broker, other trusted advisors, (continued…)

**i. Mr. Teitelbaum's Reliance on His Broker Does Not Make Him Atypical**

Defendants attack plaintiff Maurice Teitelbaum with respect to his reliance on his broker, John Simpson, in purchasing MCI shares, arguing that this reliance subjects him to an "individualized defense".[11] However, neither the relevant authorities, as shown above, nor the facts support the contention that reliance on a broker, even a broker brother-in-law, renders an individual improper as a class representative. Moreover, in fact, reliance on information provided by a broker is typical. See In re Regal Communications Corp. Sec. Litig., No. 94-179, 1995 WL 550454, *5 (E.D. Pa. September 14, 1995) (noting that "[s]everal courts have found that reliance on a broker does not defeat typicality in a case based on fraud-on-the-market theory" and collecting cases); Kronfeld v. Trans World Airlines, Inc., 104 F.R.D. 50, 53 (S.D.N.Y. 1984). ("[r]eliance on third parties such as investment counselors or knowledgeable family members is likely to be typical, rather than atypical, of the circumstances under which a

(...continued)

or friends"); Kronfeld v. Trans World Airlines, Inc., 104 F.R.D. 50, 53-54 (S.D.N.Y. 1984) ("[r]eliance on third parties such as investment counselors or knowledgeable family members is likely to be typical, rather than atypical, of the [class]"); In re Bally Mfg. Sec. Corp. Litig., 141 F.R.D. 262 (N.D. Ill. 1992) ("[c]lass representatives in a securities fraud are not required to rely exclusively on the integrity of the market"); Nelsen v. Craig-Hallum,Inc., 659 F. Supp. 480 (D. Minn. 1987) ("[Plaintiffs] may have relied in part on their brokers' statements, which may have mirrored the written documents or differed from them. Such variations in the influences on individual class members do not, however, defeat class certification unless they overwhelm the common issues. . . . It is particularly true where plaintiffs proceed on the fraud of the market theory."). See also 4 HERBERT NEWBERG et al., NEWBERG ON CLASS ACTIONS, §22.50 at 22-204 (3d ed.1992) ("The existence of oral misrepresentations will not preclude a finding of predominance when plaintiffs allege the defendants engaged in a common course of conduct.").

[11] Defendants mischaracterize events when they say that plaintiffs' counsel "recruited Mr. Teitelbaum". In fact, as he testified, it seemed, strange to him that the deal had been "going, going and no deal. And that's what made [him]. . . get upset," so he, on his own it initiative, spoke to his broker about it, and the broker, in turn, recommended a lawyer. (Teitelbaum at 98, (continued...)

substantial number of class members purchased their stock."). See also cases cited in introductory section. [12]

Defendants attempt to characterize Mr. Teitelbaum as relying on the advice of his broker *and not the market.* (Def. Mem. at 13, 27.) But this is without foundation and goes against the clear meaning of his sworn testimony.[13] For example, in the very pages that defendants cite, Mr. Teitelbaum testified "Simpson would call me up and make a suggestion, and *if I said yes . . . we'd do it.*" (Teitelbaum at 85) (emphasis supplied). Similarly, Mr. Teitelbaum stated that that an appreciation in the price of the stock even up to the purported merger price "would still not necessarily stop me from buying the stock after that *if I thought* it was a good company and it was going to make money." (Teitelbaum at 86) (emphasis supplied). In fact, Mr. Teitelbaum indicated that he regularly reviewed the front page of the quarterly reports that he received from the companies in which he owned stock to see whether they had gained or lost in income.

---

(...continued)

lines 9-13). A copy of Mr. Teitelbaum's deposition is included as Exhibit A to the Declaration of R. Joseph Barton dated January 17, 2003, and filed herewith.

[12] The reasoning of the cases cited here is also applicable to defendants' allegations concerning Mr. Knetzer and Ms. Werbowsky.

[13] Defendants' egregiously twist Mr. Teitelbaum's testimony. Although he did say, in this post-Enron world, that he generally followed the advice of his brokers because he viewed Wall Street as "kind of a Ponzi scheme," he also said that he paid attention to information from "Wall Street analysts, people at places like Merrill Lynch or Salomon Brothers" through information that was provided by his brokers, and that he subscribed to certain financial news letters, and watched Wall Street Week. (Teitelbaum at 53-55.) Contrary to defendants assertions that "the entirety of Mr. Teitelbaum's understanding about the MCI-BT merger came from his communications with Simpson" (Def. Mem. at 27), Mr. Teitelbaum testified only that he "would assume" that he first heard about the merger through Mr. Simpson, but he was not sure. (Teitelbaum at p. 84) Similarly, he stated that he simply "couldn't recall" why he thought the deal was going to go through other than the information he received from Mr. Simpson. Moreover, it is clear that Mr. Teitelbaum himself came to the conclusion that "something was crooked" and therefore determined to contact Mr. Simpson about it. (Teitelbaum at 91.)

(Teitelbaum at 56.) While Mr. Teitelbaum did testify that as a matter of general practice his broker was the most important source of information to him in making his investment decisions (Teitelbaum at 57), defendants were able to cite nothing demonstrating "exclusive" reliance on the broker. Similarly inaccurate is defendants' assertion that Mr. Teitelbaum's purchase on August 21, 1997 was made "relying on the advice of his broker." Mr. Teitelbaum actually does not mention the advice of his broker at all in connection with this purchase, and states that the reason that he made the buy was that he thought the price was good. (Teitelbaum at 94 ("The stock was going to be worth X amount of dollars when the deal went down and it was four dollars a share cheaper.").)

The two cases that defendants rely on for their proposition that Mr. Teitelbaum's reliance on his broker renders him atypical have no persuasive value in the case at bar. Greenspan v. Brassler, 78 F.R.D. 130 (S.D.N.Y. 1978) is unavailing because it flies in the face of the weight of the cases that have been decided in the twenty-five years since it was decided. Berwecky v. Bear, Stearns & Co., 197 F.R.D. 65 (S.D.N.Y. 2000), is of no use to defendants because the court, in fact, rejected defendants' arguments that various plaintiffs could not have relied on the integrity of the market because they relied on the advice of their brokers, noting that "individual questions of reliance such as those alleged are generally not sufficient to defeat class certification," and that "an investor may rely on the advice of brokers and still not be subject to a unique defense, so long as he also relied on other information, such as financial statements, or the integrity of the market." Mr. Teitelbaum testified here that, in addition to the advice of his broker, he bought the stock because he thought it was at a good price. (Teitelbaum at 84, 94) Because defendants are unable to cite a single place in which Mr. Teitelbaum indicated that he

relied on his brokers to the exclusion or negation of other market information, this argument against him must fail.

### ii. Mr. Knetzer Is Not Made Atypical by Relying on His Friend

Defendants contend that Mr. Knetzer is an atypical and inadequate representative because he received information from Dennis Martinez, a man who headed the Springfield, Missouri MCI office. In light of the law set forth in the foregoing cases this allegation must fail. Unless defendants can demonstrate that information received by a representative plaintiff materially varied from the information in the market, the receipt of such information is of no consequence to a class determination.[14] See Hallet v. Li & Fung, Ltd., 95 Civ. 8917 (JSM), 1997 U.S. Dist. LEXIS 15509, *11 (S.D.N.Y. Oct. 6, 1997) (holding that if the plaintiff has received information from company insiders that confirms, reflects, repeats, or even digests publicly available market information, that plaintiff is an appropriate class representative and finding proposed class

---

[14] Defendants' characterization of Mr. Knetzer as a "day trader" is inaccurate. In response to the question "is it fair to say that you were attempting to capitalize on short-term fluctuations in the price of stock to make profits on MCI stock?" Mr. Knetzer testified, "I was just trying to make a profit on MCI stock." (Knetzer at 91) (Exhibit B to the Barton Declaration. In response to "by buying and selling . . . on the same day were you trying to make a profit on the change in price on that day?" Mr. Knetzer responded,

> Not necessarily on the particular stock. But yes. On a stock. And what I mean by that, those things go in a series, so you buy something at $18 one day. And then maybe the next day, you buy some at 21, and then maybe the next day you buy some at 23. And then that afternoon, you decide to sell some for 23.50. The way I look at it. . I didn't make 50 cents on the stock I bought this morning, I made $5.50 on the stock that I bought three or four days ago. . .

(Knetzer at 91.) The characterization is also irrelevant because investment strategies are irrelevant on a motion for class certification. See, e.g., Carley Capital Group v. Deloitte & Touche, L.L.P., Civil Action No. 1:97-CV-3183-TWT, 1999 U.S. Dist. LEXIS 11596, *6 (N.D. Ga. June 30, 1999) (granting protective order precluding defendants from questioning plaintiffs about their investment strategies and sophistication, because "an investor's sophistication, (continued...)

representative typical even though "inside information" that he received was assertedly a "more explicit statement on the same subject"). See also Danis v. USN Communications., Inc., 189 F.R.D. 391, 398 (N.D. Ill. 1999) (concluding that a class representative must receive "non-public" information to be atypical).[15] Here, -- despite their lengthy deposition of Mr. Knetzer, and extensive interrogatories -- defendants have failed to conjure a scintilla of evidence indicating that Mr. Knetzer received special inside information, only that a friend who worked for MCI at a local sales office confirmed to him what MCI was misleadingly telling the market.

Mr. Knetzer's testimony makes clear that he received only the same information that was available to the market. He testified that Mr. Martinez "just felt" his initial comment that MCI might be the target of a merger.[16] (Knetzer at 66.) He further testified, "it's not like an insider trading type thing. He [Martinez] had no way of knowing," (Knetzer at 73.) He testified that Mr. Martinez's feeling was based on a lot of consolidation going on in the industry. (Knetzer at 65, 73.) He testified that the e-mail which was forwarded to him by Mr. Martinez after the July

(...continued)

investment experience, and reliance upon any particular misrepresentation made by Defendant are all irrelevant to the issues of class certification and reliance in a fraud-on-the-market case").

[15] The cases cited in the introductory discussion of third party information as well as in the Teitelbaum section above apply as well here. See also Moskowitz v. Lopp, 128 F.R.D. 624, 631 (E.D. Pa. 1989) (motivation for purchasing shares does "not defeat the fraud-on-the-market presumption absent convincing proof that price played no part whatsoever in [the] decision making"); In re Nat'l. Student Marketing, 1981 WL 1617 (D.D.C. Mar. 26, 1981) ("[R]eliance on non-public sources does not necessarily bar an investor from acting as a class representative" (quotation omitted).)

[16] Mr. Martinez "ran the Springfield [MCI] office," which was dedicated largely to sales and telemarketing. (Knetzer at 66). This is a markedly different situation than that in defendants' cases Landry v. PriceWaterhouse Chartered Accountants, 123 F.R.D. 474, 476 (S.D.N.Y. 1989) and Markewich v. Ersek, 98 F.R.D. 9, 10-11 (S.D.N.Y. 1981), both of which concerned plaintiffs who had access to the directors of the companies whose stock was it issue.

11, 1997, announcement of the $800 million loss was consistent with the Dow Jones announcement and that, while certain quotes from an MCI spokesperson were not in the e-mail, the e-mail generally stated, like the Dow Jones announcement, that MCI expected to no changes to the existing plan. (Knetzer at 175-77.) Moreover, he testified that the emails forwarded to him containing reports about MCI that were publicly available. Defendants have not identified any way in which the information that Mr. Knetzer received from Mr. Martinez was materially different than that received by all other class members from MCI's public statements.[17] In fact, contrary to defendant's assertions, this information was nearly identical to the information received by all other class members. In short, Mr. Knetzer received information from a friend at MCI that the merger was going to go forward unchanged. Since this is the heart of what plaintiffs allege is the fraud, the fact that Mr. Knetzer got the information from defendants through someone else is irrelevant.[18] Therefore, this argument must fail.

---

[17] Grace v. Perception Tech Corp., 128 F.R.D. 165 (D. Mass. 1989), cited by defendants, actually supports plaintiffs. Grace specifically noted that "[r]eliance on the market also includes statements of third parties that merely reiterated the misstated [market] information that forms the basis of the securities fraud claims," and found typical one individual who worked for the company and another who, *almost exactly like Mr. Knetzer*, allegedly relied on the advice of a friend who was one of the company's research engineers, because "there was no evidence in the record that [his] friend told him anything that was not available to the public." The court in Grace also noted that "[r]elying on . . . the advice of friends will not destroy typicality . . . [and] if factual differences of this nature were sufficient to defeat class certification, there could ever be a class action of securities purchasers." (Internal citations omitted.) The two plaintiffs which the Grace court did find atypical had made all or most of their purchases after a private meeting with corporate officers, including the CFO. Id. Mr. Knetzer did no such thing and is typical.

[18] Whether Mr. Knetzer thought the market overreacted to the July 11, 1997, news of the $800 million loss is relevant because investment strategies are irrelevant to the class certification decision. See, e.g., Carley Capital Group, 1999 U.S. Dist. LEXIS 11596, *6 (granting protective order precluding defendants from questioning plaintiffs about their investment strategies and sophistication, because "an investor's sophistication, investment experience, and reliance upon any particular misrepresentation made by Defendant are all irrelevant to the issues of class certification and reliance in a fraud-on-the-market case.")

Finally, defendants assertion that Mr. Knetzer is atypical because he "never saw the August 14 10-Q filing" is irrelevant. (Def. Mem. at 25.) Under Basic, Inc. v. Levinson, 485 U.S. 224, 241-42 (1988) ("Misleading statements will . . . defraud purchasers of stock even if the purchasers do not directly rely on the misstatements . . .) (internal quotation omitted). Thus, Mr. Knetzer, like the rest of the class members, is presumed to have relied on the market price, which, in turn, is presumed to have incorporated the information in the 10-Q.

Mr. Knetzer's purchase of MCI options (in addition to MCI common stock) during the class period also does not subject him "to another individualized defense on those [i.e. reliance] grounds." Def. Mem. 25 n.18. The sole authority cited, Zlotnick v. Tie Communications, 836 F.2d 818 (3d Cir. 1988), noted only that some courts had determined that options traders could not recover when neither the corporation nor the insiders issued or traded in options or *had* any other relationship with the options trader. See id. at 821 (citing Starkman v. Warner Communications, Inc., 671 F. Supp. 297 (S.D.N.Y.1987)). But, Starkman itself noted a number of courts have permitted options traders to recover and to serve as class representatives. See id. at 301 (listing cases); see also Tolan v. Computervision Corp., 696 F. Supp. 771, 774-79 (D. Mass. 1988) (denying dismissal and granting class after concluding that options traders had standing on behalf of *purchasers of* both *common stock and options to sue for* allegedly misleading projected earnings statements despite absence of allegations that defendants themselves engaged in options trading). More importantly, courts have concluded that the mere fact that an investor of common stock *also trades in options of the company* does not make him atypical. E.g. In re Oxford Health Plans, Inc. Sec. Litig., 199 F.R.D. 119, 123 (S.D.N.Y. 2001) (concluding that plaintiffs were suitable class representatives even though they were "market makers" in Oxford options in addition to purchasing Oxford common stock during the class

period); In re Adobe Systems, Inc. Sec. Litig., 139 F.R.D. 150, (N.D. Cal. 1991) (certifying class of purchasers of common stock and options, and approving individual who bought both common stock and options as class representative, noting in its typicality discussion, that "[a]]lthough the court does not base its decision to certify the class exclusively on Wells' status as a common stock purchaser for his Keogh, this would seem to be enough to give Wells standing, regardless of the outcome of the "options trader" question discussed below.") Accordingly, defendants have no "individualized defense" against Knetzer on these grounds.

**iii. Even If Ms. Werbowsky Relied on Her Relatives She Is Typical**

Defendants contend that Eleanor Werbowsky is an unsuitable class representative based on their disbelief of her sworn testimony that she was "the sole person responsible for her investment in MCI." Def. Mem. at 28. Defendants' argument fails for two reasons: (1) there is not any evidence either that she relied on anything but the market in deciding to buy MCI stock or that contradicts her testimony that she was the sole person responsible for her investment decisions; and (2) as shown above with respect to Messrs. Teitelbaum and Knetzer, whether she relied on the advice of others is simply irrelevant so long as price paid a part in her decision to purchase MCI stock.

Defeating the fraud-on-the-market presumption, requires "convincing proof that price played no part whatsoever in [plaintiff's] decision making." Moskowitz v. Lopp, 128 F.R.D. 624, 631 (E.D. Pa. 1989); see Danis, 189 F.R.D. 301, 397 (N.D. Ill. 1999). Moreover, as the authorities cited by defendants recognize, a successful challenge to a proposed class representative's credibility must be supported by "inconsistencies or contradictions in [her] testimony" AM. Int'l Sec. Litig., 108 F.R.D. 190, 195 (S.D.N.Y. 1985) (concluding that defendants presented no evidence that plaintiff should be disqualified based on credibility); see also Kline v. Wolf, 702 F.2d 400, 403 (2d Cir. 1983) (where one plaintiff testified that he relied

on a report which he later admitted did not exist at the time he allegedly relied upon it, and another *refused* to answer proper discovery questions). Similarly, in Panzirer v. Wolf, 663 F.2d 365, 368 (2d Cir. 1982), "plaintiff gave no less than four versions of her conversation with her broker."

By contrast, defendants here -- despite having taken Ms. Werbowsky's deposition for five hours – cite no contradictory testimony or other evidence of any inconsistency and offer no evidence of any kind that her investment decisions did not primarily rely on the market. They simply seem to say that this unsophisticated woman must have relied on her husband. But, Ms. Werbowsky's unrefuted testimony is that "all of the stocks in [her] portfolio" are there because she "originally had the idea to invest in that stock" and not because her husband recommended that she purchase a stock. (Werbowsky at 74.) Werbowsky (A copy of Ms. Werbowsky's deposition is attached as Exhibit C to the Barton Declaration). In fact, she testified that she purchased stocks based on whether they would rise in price. (Id. at 51.) Nothing cited by defendants or anything in her deposition suggests that Ms. Werbowsky did not rely on the market in purchasing MCI stock or that differs in any way from any other member of the class. Indeed, defendants admit the lack of any evidence to corroborate their conjecture by stating that they "*would expect to* challenge Werbowsky's contention that she … was responsible for her MCI purchases." Def. Mem. at 28. Unless and until defendants actually present some contradictory evidence – rather than merely their own ipse dixit -- rebutting the presumption of reliance, Ms. Werbowsky must be presumed to have relied on the market and is therefore a typical and appropriate class representative.

Moreover, even if Ms. Werbowsky relied on her broker or her family members for advice she is not atypical because, as discussed above with respect to Messrs. Teitelbaum and Knetzer,

reliance on the advice of others does not preclude a finding of typicality if the third party information is based on the alleged misrepresentations that form the basis of plaintiffs' actions. Numerous courts cited above have recognized that this "indirect reliance" does not render a plaintiff's claim atypical so long as the source traces its recommendation back to the misrepresentation made by the defendants. As one court explained, "[r]eliance on third parties such as investment counselors or knowledgeable family members is likely to be typical, rather than atypical, of the circumstances under which a substantial number of class members purchased their stock." Kronfeld v. Trans World Airlines, Inc., 104 F.R.D. 50, 53 (S.D.N.Y. 1984). Defendants have certainly made no allegation that Ms. Werbowsky's relatives had inside information. Accordingly, whether she received any advice from others does not necessarily make her atypical.

The sole case cited by defendants, Greenspan v. Brassler, 78 F.R.D. 130, 132 (S.D.N.Y. 1978) does not contradict this view and is readily distinguishable from the instant case. As the Abelson v. Strong, 1984 WL 15872 at *6 (D. Mass. July 30, 1987) court observed, in Greenspan "plaintiffs relied on their brother's advice [to purchase the stock] *and there was no evidence that that their brother had relied on the financial reports that contained the omissions.*" Abelson, 1987 WL15872 at *6 (emphasis in original) (distinguishing Greenspan, 78 F.R.D. at 132). In fact, the brother based his recommendation solely on his "generalized faith in [such] trusts." Greenspan, 78 F.R.D. at 132 n.6. Here, there is no evidence that Ms. Werbowsky relied on anything other than the market in making her investment decision.[19] Accordingly, defendants

[19] Additionally, even if Ms. Werbowsky's husband or daughter were actually investing on her behalf, she would not be subject to "the defense of reliance on another's expertise" as defendants charge. Binder v. Roth, No. C86-2587A, 1987 WL 124018, *3 (N.D. Ga. July 7, 1987) and Lovejoy v. AT&T Corp., 111 Cal. Rptr. 2d 711, 718 (Cal. App. 3d Dist. 2001) both pointed out, (continued…)



304780v3

have offered no evidence or relevant authority suggesting Ms. Werbowsky is an atypical class representative.

**iv. Mr. Cirella Is Typical**

Defendants attack Philip Cirella on the somewhat different reliance basis that he "admitted that at the time he purchased most, if not all, of his shares of MCI, he did not believe that the MCI/BT deal would go through on its original terms." (Def. Mem. at 23.) But Mr. Cirella made no such a statement for all of his purchases. Mr. Cirella's deposition indicates that it is likely that on the date of his first purchase he did believe that the deal would be renegotiated, because he began to feel his doubt, "probably the next day." (Cirella at 71.) Mr. Cirella also stated, in a portion of his deposition not cited by defendants for obvious reasons, that "with respect to [his] four purchases, the British Telecom offer price was more important to [him] than any independent calculation of MCI's value that [he] might have performed." (Cirella at 57.) (A copy of Cirella's deposition is attached as Exhibit D to the Barton Declaration.) At a minimum, he is a typical class representative with regard to the first shares of MCI stock that he purchased (even if defendants were right, which they are not).

This testimony is consistent with a presumption of reliance on the market and makes Mr. Cirella a typical representative even with respect to his subsequent purchases of MCI stock. The presumption of reliance on the market can not be defeated unless it is evident that the market price played absolutely no role in plaintiffs' decision making Moskowitz v. Lopp, 128 F.R.D.

---

(...continued)

that "indirect reliance" in the situation where an agent, i.e. the broker, relies on the representation to act on behalf of the principal, is perfectly consistent with the law of agency.

624, 631 (E.D. Pa. 1989).[20] Defendants point to nothing in Mr. Cirella's transcript that suggests that he did not believe at the time that he bought his stock that the market had incorporated the openly discussed risk that the merger would be renegotiated. In other words, he relied on the accuracy of the market price until he knew, after the stock price dropped upon defendants' disclosure, that the market was in fact defrauded. Mr. Cirella's deposition testimony establishes that market reliance was present in his investment decisions. For example, he states that he made his first purchase "because [he] thought it was at a favorable price." (Cirella at p. 75).

Finally, defendants provide no support for their suggestion that this issue would become a major focus of the litigation. Three of the cases that defendants cite, Kas v. Fin. General Bankshares, Inc., 105 F.R.D. 453 (D.D.C 1984), Fleck v. Cablevision VII, Inc., 763 F. Supp. 622 (D.D.C. 1991), and Kamerman v. Ockap Corp., 112 F.R.D. 195 (S.D.N.Y. 1986) are unavailing because they are proxy cases, and therefore questions of fraud on the market were not present. The Kamerman court, moreover, states that "individual questions of reliance are not appropriate in determining whether class action status is proper and thus are not sufficient to defeat class certification . . . [and] [m]oreover reliance is presumed in cases alleging omissions or fraud on the market." Id. at 197. The decision in Ganesh v. Computer Learning Ctr., Inc., 183 F.R.D. 487 (E.D. Va. 1998) simply does not apply. Unlike the plaintiffs in Ganesh, Mr. Cirella was not a short seller - he was not hoping to capitalize on a *decline* in the price of MCI stock - but a

[20] Defendants' allegations in their footnote indicating that if Mr. Cirella established that he did rely on the market for the first purchase he would also have to "demonstrate that his first purchase differed from the next three," is irrelevant at this time, because it requires the court to investigate the merits of Mr. Cirella's claim in a manner that is inappropriate on a motion to dismiss. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177-78 (1974); In re AmeriFirst Sec. Litig., 139 F.R.D. 423, 428 (S.D. Fla. 1991) (plaintiffs found typical, despite alleged unique defenses that they did not rely on the market, because "this is a question of fact which cannot be resolved at this stage in the proceedings."

purchaser of options, and nothing in the Court's decision suggests a similar rule for options purchasers. Finally, Hanon v. Dataproducts Corp., 976 F.2d 497 (9th Cir. 1992) is likewise unavailing. See id., at 509, (indicating that "the defense of non-reliance is not a basis for denial of class certification", and it appeared that the plaintiff was not an investor but a professional litigant). In short, both the evidence in the record and the case law demonstrate that Mr. Cirella is in fact a typical plaintiff.

**c. Plaintiffs Who Bought on the Last Day of the Class Period Are Typical**

Defendants argue that the purchase of stock by Messrs. Knetzer and Teitelbaum on August 21, 1997, render these individuals atypical. (Def. Mem. at 26.) As a preliminary matter, both of these plaintiffs also brought stock *prior* to August 21, 1997, and would be typical with respect to those purchases even if defendants were correct, which they are not. Next, definition of the class period is a merits oriented issue, entailing questions of whether the disclosures on August 20 and August 21, 1997, were truly curative or were only partial disclosures until the final disclosure on August 22 of the renegotiation of the merger. Factual merits issues are not properly decided on a motion for class certification. Eisen, 417 U.S. at 177-78; Sirota, 673 F.2d at 572 ("it would be improper for a district court to resolve substantial questions of fact going to the merits when deciding the scope or time limits of the class."); In re Unioil Sec. Litig., 107 F.R.D. at 621 (C.D. Cal. 1985) ("Whether subsequent statements cure any prior omissions or misrepresentations is a question of fact . . . which cannot be appropriately resolved on this motion").

Defendants' argument ignores plaintiffs' allegations that the August 21st purchases were made *prior* to defendants' August 22, 1997, final disclosure of the improperly withheld information -- the renegotiated merger price, which could not have been negotiated entirely in the brief period of time after the disclosures on the evening of August 20th and the morning of

August 21st. That the August 20, 1997, disclosure was not wholly curative is evidenced by the additional, albeit slight, stock drop which occurred after the renegotiated price was announced. The prices these plaintiffs paid for their MCI shares on August 21 reflected all material public information about MCI at the times such purchases were made, including the market's evaluation of defendants' still incomplete public statements. "The simultaneous presence of a group of persons who bought stock before the price of the stock went down, and a group of persons who bought stock after the price of the stock went down does not preclude them from being part of the same class for class action purposes." Rubenstein v. Collins, 162 F.R.D. 534, 538 (S.D. Tex. 1995). The fact that plaintiffs purchased some stock after a partially curative disclosure does not render them atypical. Id.

Even post-class period purchases are consistent with reliance on the integrity of the market during the class period, and are not atypical. In re Bally, 141 F.R.D. at 269 n.7 ("Bally's contention that Plaintiff . . . claims are atypical because he purchased stock after the proposed class period is unavailing" (citation omitted). See also In re Select Comfort Corp. Sec. Litig., 202 F.R.D. 598, 607n. 12 (D. Minn. 2001)(holding that some of the 10b-5 subclass members at issue bought stock after curative disclosure did not render them atypical of the class, and noting that courts routinely authorize classes in such circumstances, because "purchasing stock subsequent to a materially adverse disclosure, 'averaging down,' is a common technique used to decrease the average cost of an investment and which cannot be used to defeat a proposed class representative's typicality"); Malone v. Microdyne Corp., 148 F.R.D. 153, 158-59 (E.D. Va. 1993); Kronfeld v. Transworld Airlines, 104 F.R.D. at 508 (S.D.N.Y. 1984).

In support of their argument to the contrary, defendants cite cases that are simply without precedential value in the present circumstances. Few of them were decided in the past decade.[21] However, the purchase of stock after partial or complete disclosure does not render a plaintiff atypical. See In re AMF Bowling Secs. Litig., 99 Civ. 3023 (DC), 2002 U.S. Dist. LEXIS 9076, *2-3 (S.D.N.Y. May 21, 2002) holding that the class period should include time after partial disclosure, where the court could not conclude, "as a matter of law, that the July 31, 1998 'release cured the market,' thereby requiring the Court to cut off the class period at that date," and noting that "[i]t is improper to resolve substantial questions of fact going to the merits when deciding the scope or time limits of the class." (Internal quotations omitted.)

In addition, "common also sense dictates Defendants' argument must fail. If taken to its logical extreme, there could never be a class action in securities fraud cases because a representative plaintiff would be needed for every day of the class period since on each day the mix of information and the price of the stock varied." Farber v. Public Serv. Co., 1990 U.S. Dist. LEXIS 18376 (D. N.M. Dec. 3, 1990). See also Seidman v. Am. Mobile Sys., 157 F.R.D. 354, 362 n.12 (E.D. Pa. 1994) ("the fraud-on-the-market theory assumes that the market will account

[21] Many are pre-Basic: Greenspan v. Brassler, 78 F.R.D. 130 (S.D.N.Y. 1978); In re LTV Sec. Litig., 88 FRD 134 (N.D. Tex. 1980); In re AM Int'l Sec. Litig., 108 FRD 190 (SDNY 1985). Some are not fraud on the market cases: Gary Plastic Packaging Corp. v. Merrill Lynch Pierce, Fenner & Smith, Inc., 903 F.2d 176, 179-80 (2d Cir. 1990)(Def. Mem. at 13); Kovaleff v. Piano, 142 F.R.D. 406 (S.D.N.Y. 1992). Others rely on non-fraud-on-the-market cases: Rolex Employees Ret. Trust v. Mentor Graphics Corp., 136 F.R.D. 658, 663-64 (D. Or. 1991); Berwecky v. Bear, Stearns & Co., 197 F.R.D. 65 (S.D.N.Y. 2000) (relying on both Gary Plastics and In re Avon Sec. Litig., 91 CV. 2287 (LMM) 1998 U.S. Dist. LEXIS 18642 (S.D.N.Y. Nov. 19, 1998), which notes that "a representative may satisfy the typicality requirement even though that party may later be barred from recovery by a defense particular to him that would not impact other class members.") (internal quotations omitted.) One involved purchase of stock in a bankrupt company: Koenig v. Benson, 117 F.R.D. 330 (E.D.N.Y. 1987).

for disclosed information regarding a company's prior poor performance and price the stock accordingly") (citing Basic, Inc. v. Levinson, 485 U.S. 249, 243-44 (1988)).

Moreover, even if this court finds that there are dissimilar issues relating to purchases made on August 21, 1997, the proper way to deal with such issues is through the creation of subclasses, not through preclusion of certification. Thus, as a matter of fact and law, there is no "unique defense" raised by Mr. Teitelbaum's or Mr. Knetzer's post August 20, 1997, MCI purchases affecting typicality. These purchases do not, therefore, preclude these plaintiffs from serving as class representatives.

**2. The Plaintiffs Meet the Commonality Requirement of Rule 23(a)(2)**

The entirety of defendants' commonality argument consists of one sentence asserting that "for the same reasons [as set forth in their typicality section] plaintiffs cannot satisfy Rule 23(a)'s commonality requirement." (Def. Mem. at 22.) As this court recently observed, the commonality requirement of Rule 23(a)(2) is met in this Circuit where "'there is at least one issue, the resolution of which will affect all or a significant number of the putative class members.'" Jarvaise, 2002 U.S. Dist. LEXIS 6096, *4, quoting Lightbourn v. County of El Paso, 118 F.3d 421, 426 (5th Cir. 1997), cert. denied, 522 U.S. 1052, 118 S. Ct. 700, 139 L. Ed. 2d 643 (1998). See also Lorazepam, 202 F.R.D. at 26; Pigford v. Glickman, 182 F.R.D. at 348. It cannot be seriously argued that plaintiffs Teitelbaum, Knetzer, Cirella, and Werbowsky share no common issues with the rest of the class. The commonality requirement does not that all questions of fact and law be common. Jarvaise, 2002 U.S. Dist. LEXIS 6096, *5, citing Pigford at 348.

In fact, the questions these plaintiffs face -- such as whether defendants' class period statements misrepresented material facts, and whether the stock was thereby artificially inflated -- are the questions central to many, if not most, securities cases where the commonality

requirement of 23(a)(2) is regularly and readily met. See, e.g., In re Newbridge Networks Sec. Litig., 926 F. Supp. 1163, 1176 (noting that class action is appropriate where plaintiffs allege a common course of conduct); In re Oxford Health Plans, Inc. Sec. Litig., 191 F.R.D. at 374. ("Where the facts as alleged show that Defendants' course of conduct concealed material information from an entire putative class, the commonality requirement is met.").

### 3. Plaintiffs Satisfy the Adequacy Requirement of Rule 23(a)(4)

This District follows the universally recognized two-prong test for adequacy of representation, requiring that 1) the class representatives' interests not be antagonistic to those of the other members of the class; and (2) the class representatives' attorneys must be qualified, experienced, and demonstrate that they will energetically conduct the litigation. See Lewis v. Nat'l Football League, 146 F.R.D. 5, 9 (D.D.C. 1992); Covelo Indian Community v. Watt, 551 F. Supp. 366, 377 (D.D.C. 1982). Defendants concede that the class representatives' attorneys are qualified. The only questions they raise concern the adequacy of plaintiffs themselves. Defendants mostly rehash their typicality arguments to say that plaintiffs are also inadequate under Rule 23(a)(4). Defendants' also raise fundamentally flawed attacks on the sufficiency of one plaintiff's knowledge of the underlying facts and theories involved in this complex securities fraud case and misapply the PSLRA's lead plaintiff principles to class representatives. But none of the plaintiffs have interests antagonistic to the rest of the class, and they are, therefore, adequate representatives.

#### a. Defendants' Unique Defenses Arguments Fail Again

The trumped-up unique defense arguments fail in the adequacy context for exactly the same reasons that they fail to undercut typicality. The class representatives are, quite simply, no more subject to any unique defenses that are likely to become the focus of the entire litigation in

the adequacy arena than in the typicality context. Therefore, the defenses asserted by defendants do not create individual issues that constitute interests that are adverse to the class.

**i. Mr. Teitelbaum's Reliance on His Counsel Does Not Make Him Inadequate**

Defendants assert that Mr. Teitelbaum is not adequate because he has insufficient knowledge of the claims at issue. (Def. Mem. at 30-31.) However, it is well established that, "in complex litigations such as securities actions . . . a great deal of reliance on the expertise of class counsel is to be expected." Newbridge, 926 F. Supp. at 1177. Moreover, as another court in this District has held, "Class representatives are not required to have detailed understanding of the nature and facts of their case, rather they must be willing and able 'to vigorously prosecute the interests of the class through qualified counsel.'" In re Vitamins Antitrust Litig., 209 F.R.D. 251, 262 (D.D.C. 2002), quoting Nat'l Ass'n of Reg'l Med. Programs, Inc. v. Matthews, 551 F2d 340, 345 (1976). Mr. Teitelbaum has demonstrated sufficient commitment and ability to participate in this action to render him a more than adequate plaintiff.

Mr. Teitelbaum, of his own initiative, contacted his broker because he thought that there was something suspect in connection with the merger. (Teitelbaum at 98.) His broker recommended an attorney through whom Mr. Teitelbaum filed the first complaint in this action. (Teitelbaum at 98.) Mr. Teitelbaum contributed to the complaint the facts concerning his investment (Teitelbaum at 109), reviewed that complaint prior to filing it, (See Teitelbaum Certification attached to lead plaintiff motions on file herein; Teitelbaum at 106-107), provided information and documents in response to discovery requests (Teitelbaum at 120), spoke on numerous occasions with his attorneys about various discovery and factual issues, (Id.), reviewed relevant litigation documents (Id. at 122), and traveled for hours to attend a lengthy deposition, which required him to stay overnight in a city far from his home. It is clear, in short, that Mr. Teitelbaum's assertion, that "I do have an interest" in this litigation is correct. (Id. at 124).

Mr. Teitelbaum is not, as defendants allege, unfamiliar with the basic allegations of the complaint at issue. In fact, in response to a question as to what this lawsuit is about, he testified quite correctly that "I think that MCI misrepresented itself to the stock-buying public." ).[22] Id. at 96. He also noted that "The stock was X amount of dollars. When BT bought the company, it was going to be worth X amount of dollars. The stock was worth at that time less than what it was going to be worth when the BT deal went down . . . . You add two and two together, you've got certain risks that . . . I didn't know about . . . ." Teitelbaum 10/28/02 at 93–94 (emphasis added; and in response to a question about how he was damaged, answered "The price of the stock declined tremendously, 15 percent or whatever it was, in a few-day period." Id. at 99. Moreover, his deposition transcript reflected the following exchange:

> Q. And is there any other misrepresentation that MCI made that forms the basis of this lawsuit? . . . . I'm just asking about the claims that are in the lawsuit now . . . . Just the fact that MCI, in your view, covered up the 800 million dollar loss? . . . .
>
> A . . . . I wasn't privy to any information or reasons why, other than . . . I suppose I probably heard why the deal didn't go down, that they wanted to renegotiate the deal . . . . Now, I obviously heard that, because that's what caused the stock to go down . . . . So I heard that they wanted to renegotiate . . . .
>
> Q. When you say "they," who do you mean?
>
> A. BT wanted to renegotiate the sale price of [the] MCI— purchase price.

[22] Defendants' quotation of Mr. Teitelbaum as saying that he had "no idea" about the allegations supporting plaintiffs' claims until reading the complaint is taken out of context. Given that a few sentences prior to the "no idea" quotation, Mr. Teitelbaum indicated that he had heard speculation that the deal would be renegotiated only "at the end . . . when it started to fall," and that a few sentences after, he states that he "had no idea that MCI was allegedly hiding a billion dollars of expenses", he was clearly not testifying that he had "no idea" as to why the deal didn't go through. (Teitelbaum at 90-91.) In any event, since this is not one of the central allegations of the complaint, his failure to be more fully and articulately aware of it does not render him inadequate.

Id. at 99–100.

Finally, any confusion created by portions of Mr. Teitelbaum's testimony is cleared up by his supplemental affidavit (see Teitelbaum Affidavit, attached as Exhibit E to the Barton Declaration). In this affidavit, Mr. Teitelbaum clarifies, that although upon reviewing his transcript he saw that certain of his testimony focused on MCI's misrepresentations to BT, he has understood at all times since his first complaint was filed, that:

> Plaintiffs allege that MCI and its executives engaged in securities fraud to conceal the ongoing renegotiation of the merger agreement and, thereby, to maintain the price of shares of MCI stock at artificially high levels during the Class Period.

and goes on to state that, and that he has at all times:

> "recognized that Plaintiffs' allegations in this case deal primarily with Defendants' mischaracterizing to the stock-buying public that the MCI – BT merger would go forward at the previously negotiated price when in fact Defendants always knew during this period that the merger would have to be renegotiated, thereby damaging those who purchased MCI stock during that period at an artificially inflated price.

Mr. Teitelbaum is not required to be a legal or investment expert to represent the class. Plaintiffs with significantly less understanding than that possessed by Mr. Teitelbaum have been approved as class representatives. Indeed, the Supreme Court in Surowitz v. Hilton Hotels Corp., 383 U.S. 363 (1966), famously found a Polish immigrant plaintiff adequate even though she had great difficulty with the English language, did not understand her complaint at all, had little knowledge of what the lawsuit was about, did not know defendants by name or the nature of their alleged misconduct, and had relied entirely upon her son-in-law and her counsel in matters relating to the suit. Surowitz, although a derivative case, has been frequently relied upon in the class action context. See, e.g., In re Turkcell Iletisim Hizmetler Sec. Litig., 209 F.R.D. 353, 356 (S.D.N.Y. 2002) (finding a class representative adequate despite the fact that he did not speak English or grasp the nuances of a class action); Ditty v. CheckRite, Ltd., 182 F.R.D. 639,

642 (D. Utah 1998) (citing Surowitz for statement that "although some courts have inquired into the named plaintiffs' understanding of the lawsuit or their character, that factor is generally given little weight"); Schwartz v. System Software Assoc., Inc., 138 F.R.D. 105 (N.D. Ill 1991), (in 10b-5 context, citing Surowitz approvingly, as holding "notwithstanding the fact that the named plaintiff did not understand the complaint (as well as most of the English language), did not know who the defendants were or what their misconduct was, and had little knowledge of what the lawsuit was about, she was nonetheless qualified to represent the class . . . [and] an adequate representative.") See also Fradkin v. Ernst, 98 F.R.D. 478, 487 (N.D. Ohio 1983). In light of Newbridge's recognition that in cases such as this, plaintiffs can be expected to rely a great deal on counsel, 926 F. Supp. at 1177, defendants' purported "defense" concerning Mr. Teitelbaum's reliance on counsel for decision in this complex case is meritless.[23]

**ii. Ms. Werbowsky Is Adequate with Respect to Credibility**

Defendants' allegations concerning Ms. Werbowsky's credibility are meritless. There is simply no basis in the record for any assertion that Ms. Werbowsky is not credible. Defendants simply assert that they can not believe she makes her own investment decision because she could

[23] The cases that defendants cite for their assertion that plaintiffs "must possess a sufficient level of knowledge and understanding to be capable of controlling or prosecuting the litigation" (Def. Mem. at 30-31) in no way demonstrate a lack of adequacy on the part of Mr. Teitelbaum. In Berger v Compaq Computer Corp., 257 F.3d 475, (5th Cir. 2001) the court stated "we do not know whether the named plaintiffs could meet the adequacy standard." The court simply stated that the lower court had applied a wrong test, it did not identify specific facts that would render plaintiffs inadequate. Griffin v. GK Intelligence Systems, Inc., 196 F.R.D. 298 (S.D. Tex. 2000) involved one plaintiff who took a contrary position to most plaintiffs and seemed to have no understanding of the role of class counsel. In Kelley v. Mid-America Racing Stables, Inc., 139 F.R.D. 405 (W.D. Okla. 1990) plaintiffs received all of their information about their case from their attorneys. Newbridge actually holds that "in complex litigations such as securities actions, a great deal of reliance on class counsel is to be expected," and granted certification because "defendants have preferred no evidence that plaintiffs are unfamiliar with the facts allegedly by their counsel."

not recall or articulate answers to certain of their deposition questions. That is not enough. As the court explained in Tolan, 696 F. Supp. 771, in order for "credibility questions raised by the defendants" to affect "putative plaintiffs' adequacy to represent the class" the credibility must be "antagonistic or in conflict with the class they seek to represent." Id. at 780. While defendants can inquire into plaintiffs' purported credibility problems at trial, the mere inability of plaintiffs "with respect to the particular information they relied on and their memory of certain events" is of such minimal import in a fraud-on-the-market case that it "will not unduly burden the class, nor will it divert attention from the substance of the class claim." Id. As in Tolan, the mere inability of Ms. Werbowsky to remember certain details does not render her an inadequate class representative. Defendants' cases in this area are inapposite for the reasons set forth in the section of this memorandum concerning Ms. Werbowsky's typicality.

**b. The PSLRA Adequacy Standard Was Not Changed by the PSLRA**

As a last ditch effort, defendants assert that this Court should consider the "policies underlying the Reform Act" in considering this class certification motion. This argument appears to be nothing more than an inappropriate attempt to get this Court to reconsider its order approving lead plaintiffs. "Nowhere [in the Act] is it suggested that the concept of 'lead plaintiff' was intended to be coterminous with 'named plaintiffs' or 'class representatives.'" In re Initial Pub. Offering Secs. Litig., 21 MC 92 (SAS), 2002 U.S. Dist. LEXIS 23823, *15 (S.D.N.Y. Dec. 12, 2002). "Rather, 'reading the PSLRA in accordance with its plain meaning, [shows] that being a Lead Plaintiff under the PSLRA is not the same as being a Class Representative under Rule 23 F.R. Civ. P.'" Id. at *16, citing In re Oxford Health Plans, Inc. Sec.



304780v3

Litig., 191 F.R.D. at 125.[24] In fact, the legislative history of the Act makes this quite clear. The House Report states "[t]he provisions of the bill relating to the appointment of a lead plaintiff are not intended to affect current law with regard to challenges to the adequacy of the class representative of typicality of the claims among the class." H.R. Conf. Rep. No. 104-67, at 34-35.

Defendants citation to Berger v. Compaq Corp., 257 F. 3d 45 (5th Cir. 2001), for their assertion that in assessing whether the proposed class representatives are adequate the Court should also consider the policies underlying the Reform Act, is wholly misguided. The Berger court clarified the decision on which defendants rely, directly contradicting defendants' argument, stating: that "[certain of the litigants] urge that we have created an additional, independent requirement for the adequacy standard for class certification under Federal Rule of Civil Procedure 23 by reading the provisions of the Private Securities Litigation Reform Act of 1995 ("PSLRA") into rule 23(a)(4). This we have not done."[25] Berger v. Compaq Computer Corp., 279 F.3d 313 (5th Cir. 2002) (emphasis supplied). Accordingly, none of defendants' arguments suggest that the named plaintiffs are inadequate.

**B. Plaintiffs Have Shown Predominance under Rule 23(b)(3)**

Despite defendants' efforts to create individualized issues that do not exist, the

---

[24] The PSRLA simply provides that to select lead plaintiff, the court should apply a rebuttable presumption that the "most adequate plaintiff" is "the person or group of persons that- (aa) has either filed the complaint or made a motion in response to [the initial class] notice . . .; (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." Defendants do not argue that any plaintiffs with a larger loss have voluntarily come forward seeking to be a class representative.

[25] Sakrahni v. Brightpoint, Inc., 78 F. Supp. 2d 845, 850 is similarly inapposite, as it concerns a motion for approval of lead plaintiffs, not a motion pursuant to Rule 23.

cornerstone issues of law and fact in this case – falsity of MCI's representations to the market about renegotiation of the merger – are common to all members of the class. It is clear that these common issues predominate in this case. In re Unioil Sec. Litig., 107 F.R.D. at 622 (where a "plaintiff's claim is based on a common nucleus of misrepresentations, material omissions and market manipulations, the common questions predominate over any differences between individual class members with respect to damages, causation or reliance"). Yet, defendants argue that bogus individual issues of "reliance, materiality and injury" predominate.

**1. The Presence of Arbitrageurs Demonstrates That Class Certification is Proper**

According to defendants, the presence of arbitrageurs in the proposed class negates the predominance requirement under Rule 23(b)(3). This is an incorrect statement of the law.[26] In fact, the existence of arbitrageurs within the class is one of the factors used to establish that a security is traded in an efficient (open and developed) market, thus justifying the presumption of reliance under the fraud-on-the-market theory. See Cammer v. Bloom, 711 F. Supp. 1264, 1286-7 (D.N.J. 1989) (existence of arbitrageurs among the five factors employed to determine whether market is efficient for the purpose of applying presumption of reliance). Stated another way, in order to invoke the presumption of fraud, a plaintiff must prove that the shares were traded in an efficient market, Basic, and to do so, a plaintiff may show, inter alia, that the stock had numerous market makers and arbitrageurs. Cammer v. Bloom, 711 F. Supp. at 1286-7 ("The existence of market makers and arbitrageurs would ensure completion of the market mechanism; these

[26] Not surprisingly, defendants cite no case law that supports their novel arbitrage theory. Neither In re LTV Sec. Litig., 88 F.R.D. 134 (N.D. Tex. 1980) nor McGuiness v. Parnes, 1988 WL 66214 (D.D.C. June 17 1988) remotely suggests that arbitrageurs defeat class -- neither case involves arbitrageurs at all. Rather, defendants present a series of articles, which set forth general, debatable opinions about what arbitrageurs do.

individuals react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level.") See also Blatt v. Muse Tech., Inc., Civil Action No. 01-11010-DPW, 2002 U.S. Dist. LEXIS 18466, *46 (D. Mass. Aug. 27, 2002.); Binder v. Gillespie, 184 F.3d 1059, 1965 (9th Cir. 1999); Castillo v. Envoy Corp., 206 F.R.D. 464, 470 (N.D. Tenn. 2002) (class certification granted); Levine v. SkyMall, Inc., No. CIV 99-166-PHX-ROS, 2001 U.S. Dist. LEXIS 24705, *11 (D. Ariz. 2001) (class certification granted); In re Amerifirst Securities Litig., 139 F.R.D. at 430 (class certification granted).

Defendant's argument that the presence of arbitrageurs precludes certification is not only legally wrong – it makes no sense. The existence of arbitrageurs cannot simultaneously preclude class certification and also be a determinative factor in establishing market efficiency in order to apply the fraud on the market presumption of reliance. Not only is the fraud on the market theory applicable to arbitrageurs – it is the very existence of arbitrageurs that allows a plaintiff to invoke the fraud on the market presumption of reliance.

Defendants argue that arbitrageurs do not rely on the validity of the market price, but do their own research and investigation. Def. Mem. at 36. But that purchasers of stock have different motivations is not dispositive. As one court aptly put it:

> It can be stated without fear of gainsay that the shareholders of every large, publicly traded corporation includes institutional investors, short-sellers, arbitrageurs, etc. The fact that these traders have divergent motivations in purchasing shares should not defeat the fraud-on-the-market presumption absent convincing proof that price played *no* part whatsoever in their decision making.

Moskowitz v. Lopp, 128 F.R.D. at 631. (Emphasis in original.) The fact that a person trades in stock, anticipating that it will either rise or fall does not preclude reliance on the market and market price.

Nor should arbitrageurs be excluded from a class. First, in Unioil, the defendants argued that the named plaintiffs had interests adverse to short-sellers, market makers, and ins-and-outs. In re Unioil Securities Litig., 107 F.R.D. 615. Finding any differences between the named plaintiffs and class members as either related to damages or to individual issues of reliance, the court observed that neither issue would preclude class certification. Id. at 622. The court refused to limit the class so as to limit any of these investors. Id. Second, all investors buy hoping or believing a stock price will go up relative to other investment choices. That is not a determinative factor in the fraud on the market theory. Rather, the plaintiff must buy in reliance "upon the integrity of the market price of the security which was distorted by the impact of the particular misstatement or omissions. When the investor goes into the market place, he is relying on the belief that the price of the stock, whatever it is, has not been affected by deception." HSL, Inc. v. Daniels, No. 81 C 7117, 1983 U.S. Dist. LEXIS 14322 (N.D. Ill. Aug. 25, 1983). See also, Basic, 485 U.S. at 247 ("An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price.")

In sum, defendants' argument that the presence of arbitrageurs would be "subject to myriad individualized defenses on the grounds of reliance and materiality" is without merit. Rather, the presence of arbitrageurs in the class establishes market efficiency and hence, the presumption of reliance, which in turn establishes the predominance of common issues. Moreover, any disparate level of sophistication and market strategy between class members does not prevent class certification where all class members purchased shares in a market polluted by false or misleading statements.

**2. Defendants' Allegations of Market Skepticism Do Not Vitiate Predominance**

According to defendants there was some market skepticism about the merger, and therefore individual investors, like Mr. Cirella, did not rely on the defendants' false statements.

Def. Mem. at 40. Neither the facts nor the law support that contention. The presence of individual questions as to reliance does not mean that common questions of law and fact to not predominate over questions affecting individual members as required by Rule 23(b)(3). Eisenberg v. Gagnon, 766 F.2d 770, 786 (3d Cir. 1985); See also Snider v. Upjohn Co., 115 F.R.D. 536, 541 (E.D. Pa. 1987) (finding predominance requirement met because the "importance [of individual issues of reliance and damages] fails to outweigh the common question of whether defendants made materially false and misleading statements and failed to disclose material information"); Riordan v. Smith Barney, 113 F.R.D. 60 (N.D. Ill. 1986) (rejecting defendants' argument that individual issues of reliance would defeat finding of predominance). If plaintiffs and every class member were each to bring an individual action, they would still be required to prove the existence of the defendants' conduct in order to prove liability. See Snider, 115 F.R.D. at 541.

### 3. Common Questions Predominate Despite Various Purchases

Defendants' argue that predominance has not been met because the class will contain other investors who bought stock on August 21 and they "would face the same individualized defenses that make Knetzer and Teitelbaum atypical." (Def. Mem. at 41.) As shown above, however, the August 21st purchasers are appropriately included in the class because the August 20th disclosure by defendants did not cure the fraud.

Defendants' additional argument – that individual issues predominate where a class period contains a wide variety of misrepresentations – is untenable and should be summarily rejected. This class is only six weeks long. Courts have not hesitated to find the existence and predominance of common questions even when different misrepresentations have been distributed over a period of years. Blackie v. Barrack, 524 F.2d 891, 902 (9th Cir. 1975), cert.

denied, 429 U.S. 816 (1976) (class certified where there was a common thread of misrepresentations in 45 different documents disseminated over a 27 month period). Moreover, common questions predominate where, as here, defendants release a series of similar misstatements and omissions over the class period. See e.g., Piel v. National Semiconductor Corp., 86 F.R.D. 357, 368 (E.D. Pa. 1980) (finding a common question where "plaintiff has alleged that the defendants' conduct constituted a common nucleus of operative facts or a single, unitary scheme"); Herm v. Stafford, 461 F. Supp. 508, 514 (W.D. Ky. 1978) ("While different members of the class may have relied on different reports and statements, repeated [common and interrelated] misrepresentations as alleged herein satisfy the 'common question' requirement."). Defendants' mischaracterize the misrepresentations as a "wide variety" of statements. In fact, plaintiffs have alleged a series of similar misstatements and omissions over the class period, namely, that MCI would move forward with the merger as planned.

Finally, defendants argue that the issue of damages defeats certification under Rule 23(b)(3). Defendants admit, as they must, that the issue of individual damages is not a sufficient basis to deny certification; however, relying on In re Merrill Lynch Sec., 191 F.R.D. 391, 397 (D.N.J. 1999), they seek to muddle "proof of injury" with measure of damages, and, thus, try to persuade the Court that the damage issue here creates predominant individual issues. It does not. Defendants' reliance on Merrill Lynch is completely misplaced. That case was a lawsuit against three brokers who accepted and executed buy and sell orders for NASDAQ stocks. Id. at 393. Plaintiffs alleged that the brokers could have executed the orders at better prices by using online trading services, but failed to do so, and thereby inflated their profit margins at the expense of the plaintiffs. Id. Unlike in the typical fraud on the market case – there was "no generic misrepresentation or omission that uniformly across the market affected a security's value,

causing each purchaser to be injured by the same inadequate disclosure." There was not even certainty that injury would exist if the allegations were true. Id. at 397. (citations omitted.) In this case, defendants' misrepresentations artificially inflated the stock prices and those who bought those stocks at inflated prices were injured thereby.[27] The amount of their damages is an issue that does not overwhelm the common questions. Defendants have offered no reason why this case should differ from the countless securities class actions that have come before it, for which courts have routinely held that individual issues of damages do not defeat class certification. See, e.g., In re United Energy Corp. Solar Power Modules Tax Shelter Inv. Sec. Litig., 122 F.R.D. 251 (C.D. Cal. 1988).

---

[27] The presence of in-and-out purchasers does not present individualized injury issues that predominate either. In re LTV Sec. Litig., 88 F.R.D. at 148 ("[t]his argument has, because of its simplicity, immediate appeal. But this argument fails to deal with the circumstance that that one who has both bought and sold in the 'tainted market' may nonetheless have suffered an injury.") Id. Defendants' in-and-out argument, based on conflicts discussed in In re Seagate Tech. II Sec. Litig., 843 F. Supp. 1341 (N.D. Cal. 1994), has been widely discredited. The Seagate II theories were uniformly rejected before that case was decided and have been widely rejected since as in disregard of controlling Supreme Court precedent (Eisen, 417 U.S. 156) and controlling Ninth Circuit precedent (Blackie, 524 F.2d 891). See e.g., In re Proxima Corp. Sec. Litig., Case Number 93-1139-IEG (LSP), 1994 U.S. Dist. LEXIS 21443, *53 (S.D. Cal. May 3, 1994) (refusing to apply the Seagate II analysis); In re Oxford Health Plans, Inc., 191 F.R.D. 369, 377 (S.D.N.Y); Eisenberg v. Gagnon, 766 F.2d 770, 786 (3d Cir. 1985); Snider v. Upjohn Co., 115 F.R.D. 536, 541 (E.D. Pa. 1987); Riordan v. Smith Barney, 113 F.R.D. 60 (N.D.Ill. 1986). In fact, it has been widely held that in-and-out purchasers suffer damages as a result of defendants' fraudulent common course of conduct and, therefore, have claims that are common with the other members of the class. In re LTV Sec. Litig., 88 F.R.D. at 148-49. Courts routinely certify classes made up of both types of investors. See, e.g., Nelsen v. Craig-Hallum, Inc., 659 F. Supp. 480, 489 (D. Minn. 1987) (refusing to exclude those who sold before the close of the class); In re Scott Paper Co. Sec. Litig., 142 F.R.D. 611, 616 (E.D. Pa. 1992) (no conflict between in-and-out trader and rest of class); In re AM Int'l Inc. Sec. Litig., 108 F.R.D. 190, 196 (S.D.N.Y. 1985) ("the mere fact that a plaintiff sold stock during the class period does not in itself disqualify him from acting as class representative"). The difference between in-and-out traders and those who hold their stocks is merely a difference in the calculation of damages – it does not create a conflict that "goes to the heart of the lawsuit." Id.

**4. The August 20th Statement Did Not Cure Defendants' Misrepresentations**

Defendants argue that MCI's August 20, 1997, announcement is a partially curative disclosure, and, as such, all those who purchased stock on August 21, 1997, should be excluded from the class, because the disclosure "cured" any earlier misstatements or omissions. (Def. Mem. at 45.) As noted above, at this stage of the litigation the inherently factual question of whether the August 20th disclosure is truly curative is premature, and would more appropriately be addressed at trial. In order for a disclosure to be "curative" it must specifically address the false and misleading statements. Here, that is a question of fact that should follow discovery. See, e.g., Marksman Partners L.P. v. Chantal Pharm. Corp., 927 F. Supp. 1297, 1307 (N.D. Cal. 1996) (rejecting defendants' argument that an exhibit to the company's annual report disclosed the accounting methods "where it [was] unclear that the contents of the addendum directly address[ed] the allegedly misleading information in the statements."); SEC v. Rana Research, 8 F.3d 1358, 1363 (9th Cir. 1993) (finding that a "grain of truth" embedded in a press release did not cure previous false statements); Provenz v. Miller, 102 F.3d 1478, 1493 (9th Cir. 1996) (disclosure concerning the "risky nature" of company's stock and unpredictability of company's revenues failed to offset fraudulent statements concerning improper accounting practices). Indeed, for a disclosure to be truly curative, defendants "must prove that the information that was withheld or misrepresented was 'transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by insider's one-sided representations.'" Id. at 1492-3 (citations omitted). The subsequent disclosures "must be, at minimum, complete and accurate enough to counterbalance the misleading effect of those earlier statements." In re Digi Int'l Inc. Sec. Litig., 6 F. Supp. 2d 1089, 1102 (D. Minn. 1998).

In Rana, 8 F.3d at 1358, defendants announced that a firm offer had been made to acquire all of the corporation's stock. Id. at 1360. After the alleged acquirer subsequently denied the acquisition, the corporation later issued another statement that it did intend to pursue the acquisition. Id. at 1361. Rejecting defendants' contention that the second press release contained curative disclosures, the court noted that "[n]ot every mixture with the true will neutralize the deceptive." Id. at 1363, citing Virginia Bankshares v. Sandberg, 501 U.S. 1083, 1097 (1991). "It is not surprising that the series of purportedly 'curative' statements . . . failed to squelch investor speculation ignited by the [initial misleading statements]. While Defendants may have ceased their misrepresentations, it cannot be said that investors were fully aware of all of the facts and were no longer deceived." Id.

Here, defendants rely on an August 20th press release, in which defendants announced only that it was "reviewing the economic terms" of the merger agreement and that "there can be no assurance as to the outcome of the discussions." This disclosure is not fully curative in that it fails to completely and accurately address all of MCI's previous false statements concerning the merger. Specifically, MCI announced that on April 3, 1997 its shareholders had approved the merger. Cplt. ¶ 45. The representations MCI made to counter any public perception that the merger was being renegotiated to favor of BT made it clear that the merger would go through without any change in the terms. These representations were corroborated by the fact that there was a penalty clause which would result in BT's paying $450 million if the merger did not go through, and that three of BT's executives were on MCI's board of directors, and therefore it was assumed that BT had already known about the MCI's costly efforts of breaking into the local phone market. Immediately after MCI downgraded its forecasts, it then reassured investors that the downgrade would have no adverse implications for the merger. Cplt. ¶54. On July 11, 1997

it was reported that MCI "expect[ed] no changes to the existing dataplan with British Telecommunications PLC as a result of its discussions with BT over MCI's downgraded forecasts for its local U.S. market operations." Id. MCI informed the Wall Street Journal that BT "[wa]sn't likely to alter its plan to buy MCI for $21 billion." Cplt. ¶55. On July 14, 1997, USA today reported that MCI said renegotiation would not happen and "the terms of the merger would remain in place." Id. Further, it was widely reported that BT had always been keenly aware of MCI's efforts to enter the local markets and how expensive that would be. Cplt. ¶57. On July 15, 1997, defendant Price, MCI's Chief Operating Officer, stated that "We are going straight ahead with the merger . . . We have a deal which this investment community has not just endorsed but we were selling . . . ." Cplt. ¶59. On July 15, 1997, Price stated that the local market entry costs would not hurt the merger, because both MCI and BT knew that the local market was a huge opportunity for the combined entity. Cplt. ¶60. On July 17, 1997 it was reported MCI continued to maintain that the terms of the agreement did not allow the deal to be reopened and MCI insisted it would hold BT to the original price. Cplt. ¶61. Moreover, analysts, relying on assurances from MCI, continued to report that the deal would go forward as planned. Cplt. ¶67. Indeed, MCI was insisting that the merger terms <u>could</u> <u>not</u> be renegotiated. Cplt. 68. On August 14, 1997, MCI filed its quarterly report for the Second Quarter on Form 10-Q with the SEC, which failed to disclose that the parties were renegotiating the terms of the merger. Cplt. ¶69. The Form 10-Q assured the investing public that the merger would proceed as agreed upon, conditioned only upon regulatory approval, which was expected that Fall. Cplt. ¶ 70. Five days later, it was reported again that a wide-ranging review by senior executives announced after the profit warning that it expected to confirm the offer terms, but to rein in MCI's investment plans to reduce losses. The Form 10-Q was perceived by the investment

community to be evidence that no substantive changes in the terms under discussion because 10-Q's must contain all material information. Cplt. ¶76. Thus, MCI's filing of its Form 10-Q solidified the view among investors that MCI and BT would not renegotiate the merger or the $21 billion purchase price. Cplt. ¶78.

Accordingly, the August 20th announcement that MCI and BT were "reviewing the economic terms" of the merger agreement and that "there can be no assurance as to the outcome of the discussions," was not fully curative. That they were "reviewing the economic terms" does not specifically state that the price would be changed, and given all of the continuous assurances and the huge penalty for renegotiation, it is not even clear what the discussions involved. Further, on August 21, 1997, it was reported that MCI and BT were stressing that the deal remained "intact." In sum, these purported disclosures did not provide investors with the type of specific, substantive information that is necessary to discredit defendants' misleading statements "so obviously that the risk of real deception drops to nil." Virginia Bankshares, 501 U.S. at 1097.

C. **Class Is Superior to Other Means for Adjudication**

Relying on every prior argument, defendants contend that certain unspecified "individualized facts" cause "serious drawbacks", which undermine the superiority of class-wide resolution of the issues in this case and instead favor the repetitive resolution of these issues in thousands of individual actions. (Def. Mem. at 44.) Defendants contest without explanation only one of the four factors to be considered on a superiority determination -- that unspecified "'difficulties likely to be encountered in the management of [this case as] a class action'" are for some unspecified reason "tremendous." (Def. Mem. at 44.) As explained in plaintiffs' opening brief, ("Pl. Mem.") securities actions are ideally suited for, and better resolved as, class actions and in fact "there is no real contention that the class mechanism is not superior to other available

methods for the fair and efficient adjudication of [a securities fraud case]. In fact, … the class action is an ideal way to ensure private enforcement of the federal securities laws." In re Western Union Sec. Litig., 120 F.R.D. 629, 638 (D.N.J. 1988.); See Pl. Mem. at 25-27. As defendants' have failed to identify a single difficulty in the management or this class or other reason rebutting superiority, this securities action is likewise an ideal and superior method to resolve these claims.

## III. CONCLUSION

For all the above reasons, and those set forth in plaintiffs' opening memorandum, class should be certified here.

Dated: January 17, 2003

Respectfully submitted,

COHEN, MILSTEIN, HAUSFELD
& TOLL, PLLC

By: ______________________________
Herbert E. Milstein, Esquire (D.C. Bar No. 252030
Daniel S. Sommers, Esquire (D.C. Bar No. 416549)
R. Joseph Barton, Esquire (D.C. Bar No. 476510)
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, D.C. 20005
(202) 408-4600

*Plaintiffs' Liaison Counsel*

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
Jeffrey G. Smith, Esquire
Kate McGuire, Esquire
270 Madison Avenue
New York, NY 10016
(212) 545-4600

ABBEY GARDY, LLP
James S. Notis, Esquire
Ilana Kohn, Esquire
212 East 39th Street
New York, New York 10016
Plaintiffs Co-Lead Counsel

*Plaintiffs Co-Lead Counsel*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE MCI COMMUNICATIONS CORP. SECURITIES LITIGATION | Civil Action No. 1:97CV01976 (RWR) Judge Richard W. Roberts |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of January, 2003, I caused to be served by Overnight Delivery, a true and correct copy of the foregoing Plaintiffs' Reply Memorandum In Support of Motion for Class Certification and the Declaration of R. Joseph Barton, upon the counsel listed below.

James P. Rouhandeh, Esquire
Gregory G. Ballard, Esquire
Davis Polk & Wardwell
450 Lexington Avenue
New York, New York 10017

David A. Handzo, Esquire
J. Alex Ward, Esquire
JENNER & BLOCK, LLC
601 Thirteenth Street, N.W.
Washington, D.C. 20005

**Counsel for the MCI Defendants**

R. Joseph Barton